**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
* * *

JACQUELINE LAWRENCE, et al

Plaintiff(s),

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT et al

Defendant(s).

Case No. 2:16-cv-03039-RFB-NJK
(Consolidated with Case No. 2:18-cv-02314-
RFB-CWH)

**ORDER**

## I.    INTRODUCTION

Before the Court are Defendant Brian Montana's Motion to Dismiss, Defendants Robert
Bohanon, Las Vegas Metropolitan Police Department ("LVMPD"), James Ledogar, and Blake
Walford's Motion for Summary Judgment, Defendant Brian Montana's Motion for Summary
Judgment, and Consol Defendant United States's Motion for Summary Judgment. ECF Nos. 83,
86, 87, and 88.

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed their complaint on December 30, 2016. The complaint asserts Fourth
Amendment excessive force and denial of medical care claims via 42 U.S.C. § 1983, substantive
due process claims, battery, negligence, wrongful death via the Federal Tort Claims Act ("FTCA")
(28 U.S.C. §1346(b)), Monell[1], and Bivens claims for supervisory liability, excessive force, and
substantive due process violations. Id.

---

[1] Plaintiffs have since dropped their Monell claims against Defendant LVMPD.

On July 17, 2017, Defendants  the United States Department of Justice ("US DOJ") and United States  Marshal Service filed a motion to dismiss on the basis that the Court did not have subject matter jurisdiction over them because Plaintiffs had not exhausted their administrative remedies under the FTCA. ECF No. 20. Plaintiffs filed their first amended complaint adding Defendant Brian Montana. ECF No. 21. DOJ then filed a motion to dismiss the first amended complaint on July 31, 2017. ECF No. 24.

On November 9, 2017, the Court dismissed the First Amended Complaint's Ninth and Tenth claims for relief without prejudice. On April 9, 2018, Plaintiffs filed a stipulation to file amended pleadings. The operative second amended complaint was filed on April 9, 2018. On June 12, 2018, Defendants US DOJ and US Marshals moved to dismiss the second amended complaint. On November 15, 2018, the Court dismissed US DOJ and the US Marshals Service without prejudice. ECF No. 77. LVMPD answered on April 23, 2018. ECF No. 63. Defendants United States DOJ Marshals service and DOJ moved to dismiss on June 12, 2018. ECF No. 65.

The Court granted Defendants' Motion to Dismiss without prejudice as to the United States Department of Justice and United States Marshals Service. ECF No. 77. On December 5, 2018 Plaintiffs filed a complaint against Defendants United States and Brian Montana, asserting a wrongful death claim under the False Claims Tort Act, and Bivens Fourth Amendment excessive force and Fifth Amendment substantive due process claims in the case 18-cv-2314.

On January 8, 2019, case 18-cv-2314 was consolidated under 16-cv-03039. ECF Nos. 78, 79. Defendant United States filed its answer to the Second Amended Complaint on April 22, 2019. ECF No. 82. Defendant Brian Montana moved to dismiss on April 22, 2019. A response and reply were filed. ECF Nos. 84, 85. Defendants Robert Bohanon, LVMPD, James Ledogar and Blake Walford moved for summary judgment on June 5, 2019. ECF No. 86. A response and reply were

filed. ECF Nos. 90, 98. Defendant Brian Montana moved for summary judgment on June 5, 2019. ECF No. 87. A response and reply were filed. ECF Nos. 99, 100. Defendant United States moved for summary judgment on June 5, 2019. ECF No. 88. A response and reply were filed. ECF Nos. 94, 99.

### III. FACTUAL BACKGROUND

The Court makes the following findings of undisputed and disputed fact.

#### a. Undisputed Facts

##### i. Background

Keith Childress, Jr was arrested and charged with armed robbery, kidnapping, aggravated assault, and theft based on a home invasion in Arizona in 2013 along with three other co-defendants. The criminal trial lasted from October 26, 2015 through December 17, 2015. Childress attended the trial.

However, on the date the guilty verdict was read, Childress left Arizona and a warrant was issued for his arrest. Childress was listed in the National Crime Information Center (NCIC) as "armed and dangerous with violent tendencies." On December 29, 2015, the Las Vegas Field Office for the U.S. Marshall Service received notice from the Maricopa County Arizona U.S. Marshall Service about the possibility that Childress might be in Las Vegas with his uncle, Vincent Matlock. One of the Deputy United States Marshals assigned to the case was Defendant Brian Montana.

On December 30, 2015, the task force conducted surveillance for several hours at Matlock's apartment, which was located in the Monaco apartment complex near Desert Inn Road and Durango Drive.

### ii. Chase of Childress Preceding the Shooting

On December 31, 2015, at approximately 1:55pm , the marshals saw Childress and Matlock leave Matlock's apartment and walk toward Matlock's car, a black Hyundai. The marshals activated lights and sirens on at least one of their cars and Childress ran. Defendant Brian Montana along with nonparty deputy marshal Desiree Sida, proceeded to chase after Childress. The U.S. Marshals attempted to stop Childress from leaving in Matlock's vehicle. One marshal recovered a gun from the vehicle registered and belonging to Vincent Matlock.

Upon realizing that Childress was going to successfully escape the complex, nonparty Deputy Marshal Kozisek radioed LVMPD for assistance in setting up a perimeter. Childress ignored all of the U.S. Marshall's commands to surrender. At approximately 2:02 pm, LVMPD dispatch broadcast that a foot pursuit was occurring and that there was a need to set up a perimeter.

The dispatcher relayed that Childress was hopping walls, running through yards, and climbing on rooftops. LVMPD Sergeant Bohanon was at his house eating lunch when he heard the dispatch call. Bohanon requested additional information, and Deputy U.S. Marshal Brian Montana radioed that Childress was an "attempt 420 (homicide) suspect. LVMPD Dispatch then asked whether the suspect was armed. Montana broadcast an answer of "unknown." Bohanon assigned himself to the call, activated his body worn camera, and began driving to Childress's last known location. During the drive, Bohanon learned that a firearm was found inside Matlock's vehicle.

### iii. The Shooting

As Bohanon was driving to the call, LVMPD Officer Walford[2] arrived on the scene and took up a perimeter spot at Golden Cypress Court and Maple Valley Street. Neither Bohanon nor Walford ever received any information that the suspect had harmed anyone, had other prior acts

---

[2] Walford's bodycam footage was not available, because he did not activate his bodycam during the encounter with Childress.

of violence, or that he was under the influence of drugs or alcohol. Bohanon and Walford did not have any information that Childress had any criminal record, other than the false information that Childress was wanted for attempted homicide.

Walford received information from LVMPD's Air Unit that Childress was climbing over residential walls and running along roof tops of residential homes. As Walford approached the street of Gilded Crown Court, Bohanon's patrol vehicle drove past him. After turning onto Gilded Crown Court, Bohanon encountered Childress walking on the right side of the road towards the dead-end portion of the cul-de-sac. Bohanon was in a marked black and white police SUV with its overhead lights activated.

Childress began to cross the street. Bohanon could see Childress's left arm and body, but not his right hand or side. As Bohanon slowed down, Walford joined him and began walking alongside his SUV. Bohanon stopped, exited his vehicle, pointed his firearm directly at Childress, and ordered him to "get on the ground" two times. Childress looked directly at Bohanon but continued to walk away. Bohanon could see the full right side of Childress's body. But Bohanon could see a black object in Childress's right hand that Bohanon believed Childress was "indexing" as if it were a firearm.

Video of Bohanon's bodyworn camera that captured the incident never shows Childress holding a black object in either hand. Bohanon considered that the black object he saw could be a cellphone. Bohanon did not see anything in Childress's left hand.

Bohanon unsuccessfully ordered Childress to "get on the ground" two more times. As Childress continued to walk toward the houses, Childress began to steer his vehicle toward Childress and broadcast, "he's got something in his hand." Childress continued to ignore

Bohanon's commands and walked up a driveway. Bohanon again stopped his car, pointed his firearm at Childress, and issued orders to "show me your hands" and "let me see your hands."

Walford joined Bohanon and the officers took position behind a red Pontiac vehicle. Walford says he saw Childress walking across the street with a black object in his hand but Walford never specifically identified the object as a gun.

Bohanon was also wearing a Level 3A bulletproof vest and had TASER X26, OC spray, and baton. Immediately after reaching the red vehicle, Bohanon told Walford, "he's got a 413 (gun)" and unsuccessfully ordered Childress to "get your hands up" two more times. Bohanon admitted he had yet to identify anything on Childress as a gun at that point. Walford also issued commands for Childress to get on the ground. Bohanon warned Childress that he was "going to be surrounded" because a K-9 unit was on its way. Bohanon next ordered Childress to "let me see our hands, drop the gun." Bohanon continued to instruct Childress to "drop the gun" and "to surrender." Childress never said a word and never made any attempt to communicate that the object was not, in fact, a gun. According to Bohanon, the totality of Childress's actions led him to believe the object was a gun. Eventually, Defendant Brian Montana and nonparty Deputy Marshal Desiree Sida, joined Bohanon and Walford at the Pontiac. Bohanon informed them that Childress "has a gun in his right hand." At this point, Bohanon believed the officers were likely to end up in a standoff.

At some point, Childress left the corner of the house and began to walk towards the officers. During this period helicopters continue to hover over the officers and Childress. Right before Childress approached the officers, Bohanon said, "Do not advance, you will be shot," and "Do not walk towards us," twice. Bohanon, Walford, Montana, and Sida all had their guns pointed at Childress as he walked towards them. Childress had his right hand either in his front pocket or

behind his leg. Walford claims that Childress 's right hand, including all of his fingers were inside his pocket and that Walford could only see the top backside of his hand near his wrist. Bohanon could not see Childress 's right hand at all and did not know whether Childress had an object in his right hand. As Childress continued to walk towards the officers, both Bohanon and Walford opened fire on Childress. Bohanon shot first, immediately followed by Walford. Bohanon fired two shots and Walford fired three. Prior to the first shot, neither officer ever saw Childress 's right hand or right arm come up and neither ever saw Childress point an object at them. Montana and Sida also never saw Childress 's hand or any object come out of Childress 's pocket prior to the shots. Bohanon continued to issue verbal commands to Childress to "drop the gun" and he warned Childress that "if you advance on us you will be shot," and "do not walk toward us." Within seconds of being told that if he "advance[es]" or "walk toward us" that he will be shot, Childress left the house and began walking directly toward the officers. Childress's left hand remained visible but his right hand near his right side was not visible. Bohanon gave one final order "do no walk toward us," and then he opened fire at Childress. Childress was about 15 yards from the officers when they opened fire. Both officers agree that Childress never raised his right arm or pointed the object at them. All of the shots occurred within eight seconds and after the officers had unsuccessfully given over 25 verbal commands.

It was apparent to both officers that Childress had been struck by the first volley of shots. After Childress fell to the ground, both Bohanon and Walford shot at Childress two more times for a total of four shots. Bohanon still could not see a black object on Childress. Bohanon believed that his third and fourth shot also struck Childress. There was an approximately two second pause between Bohanon's first volley and second volley. During this two second pause, Bohanon moved to get a better view of Childress . In between the first and second volley, Bohanon knew that

Childress 's right hand was out and away from his body. Walford estimates that there was a five second pause between his first volley and second volley.

After the first volley, Walford had time to reassess and saw that Childress was on the ground. In between the first volley and second volley, Walford never saw a black object anywhere in Childress 's hand or on his person, never saw Childress point a black object at him, and never saw Childress 's arm coming up in his direction with or without an object in it. Sida was watching Childress the entire time while Childress was walking and when he was on the ground and never saw anything that she thought was a weapon or identified as a gun on Childress. At no time during the incident did Childress ever verbally threaten any of the officers.

Although both Montana and Sida had their guns pointed at Childress, neither ever discharged their weapon. When Childress went to the ground, Sida did not see any weapon in Childress 's hand. After Childress went to the ground, Montana could see both of Childress 's hands and did not see a gun in his hands, on his person, or on the ground. After Childress went to the ground, Montana believed he did not need to shoot because based on his training and observations he had no reason to fire. Once Childress was shot and on the ground, Bohanon continued to give verbal commands that Childress "drop his gun." Bohanon, while maintaining his focus on Childress, ordered medical be dispatched to the scene, "if you have not already done it." Medical was requested within thirty seconds of the shooting and was immediately en route.

### iv. The K-9

A K-9 unit arrived shortly after or just before Childress was shot. Prior to deploying the K-9, Childress was not moving. Ledogar did not give a warning that he was going to deploy the K-9 prior to deployment. Ledogar directed the K-9 to Childress and the other officers followed close behind. The dog bit Childress's leg as he lay on the ground for approximately 15 seconds. The K-

9 held his bite on Childress for approximately fifteen seconds. Once the K-9 was controlled, several officers handcuffed Childress's bleeding body and searched him for weapons. Both of Childress's arms were out and clearly visible with nothing in either hand when Bohanon approached. Montana and Sida grabbed a hold of Childress's arms and placed Childress onto his stomach as an LVMPD officer handcuffed Childress. After Childress was handcuffed, Walford patted Childress down and pulled out a black cell phone from Childress's right pocket. The cell phone was approximately 4 inches in length and 2 inches in width.

Unable to find a gun on Childress, the officers continued to search Childress and the area surrounding him. None of the officers on scene provided Childress with medical aid. Bohanon concedes that he now believes the black object he had seen in Childress's hand was his cell phone.

### b.  Disputed Facts

The Court finds the following fact to be disputed: whether Childress had his right hand near his pocket when approaching the officers, and whether Childress was moving or had access to his pocket after being shot and falling to the ground. The remainder of the parties' dispute concerns the legal effects and appropriate inferences to draw from the facts.

### IV.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322(1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

If the movant has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

Summary judgment in excessive force cases should be granted sparingly, because "[w]hether a particular use of force was reasonable is rarely determinable as a matter of law." Green v. City & Cty. of San Francisco, 751 F.3d 1039, 1049 (9th Cir. 2014) (citing Chew v. Gates, 27 F.3d 1432, 1443 (9th Cir. 1994)).

## V. DISCUSSION

### a. Defendant Brian Montana's Motion to Dismiss and Motion for Summary Judgment

#### i. The Court finds that it has personal jurisdiction over Montana in the 2018 case, but not in the 2016 case.

"A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Rule 4 of the Federal Rules of Civil Procedure." Benny v. Pipes, 799 F.2d 489, 492 (9th Cir. 1986). "So long as a party receives sufficient notice of the complaint, Rule 4 is to be liberally construed to uphold service. Travelers C.as & Sur. Co. of Am. v. Brenneke, 551 F.3d 1132, 1135 (9th Cir. 2009)(internal citations omitted). However, "neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction without substantial compliance with Rule 4." Benny, 799 F.2d at 492 (citation and quotes omitted).

Rule 4(b) requires that a "summons must be issued for each defendant to be served." Fed. R. Civ. P. 4(b). Rule 4(i)(3) requires that when a federal employee is being sued in connection with actions or omissions that occurred in connection with their work on behalf of the United States, the party must serve the United States *and* the officer. Fed. R. Civ. P. 4(i)(3). However, the Court must allow a party a reasonable time to cure a failure to comply with Rule 4(i)(3). Fed. R. Civ. P. (i)(4). Finally, Rule 4(m) gives parties 90 days to serve defendants after the complaint is filed. Fed. R. Civ. P. 4(m). If, however, the plaintiff shows good cause for their failure to meet the time limit, the Court "must extend" the time for service for an appropriate period. <u>Id</u>.

This action consolidates two cases—a 2016 case that did not originally name Montana as a defendant, and a 2018 case that did. Both cases were brought by the same plaintiffs, and subsequent amendments of the 2016 case named Montana in his individual capacity and asserted the same claims against him as were asserted in the 2018 case, which the Court consolidated with the 2016 case in January 2019. Montana now argues that the Court does not have personal jurisdiction over him in the 2016 case, because Plaintiffs failed to properly complete service of process on Montana.

Plaintiffs filed their First Amended Complaint in the 2016 case naming Montana as a new defendant on July 20, 2017. Plaintiffs did not serve Montana until January 31, 2018, far past the 90-day deadline imposed by Rule 4(m) of the Federal Rules of Civil Procedure. Plaintiffs filed their Second Amended Complaint in the 2016 case on April 9, 2018. Plaintiffs did not serve the Second Amended Complaint on Montana. An original complaint is only superseded when the amended complaint is properly served, thus the operative complaint with regard to Montana is the First Amended Complaint. <u>Doe . Unocal Corp.</u>, 248 F.3d 915 (9th Cir. 2001) (adopting <u>Doe v. Unocal Corp.</u>, 27 F.Supp.2d 1174, 1180 (C.D. Cal. 1998) as its opinion).

Montana argues that there were two defects in Plaintiffs' service of the First Amended Complaint. First, Montana argues that Plaintiffs failed to serve the United States as a separate party under Rule 4(i)(3). Second, Montana argues that Plaintiffs has not sufficiently showed good cause for their late filing in Rule 4. Plaintiffs argue that the United States *was* properly served the First Amended complaint, because the United States had consented to electronic filing, and pursuant to District of Nevada Local Rule IC 4-1, participation in the court's electronic filing system constitutes consent to electronic service of the pleadings. LR IC 4-1. Thus, Plaintiffs argue, when they filed the First Amended complaint in the 2016 case that named Montana as a defendant, the United States, which was also represented by the District of Nevada's Assistant United States Attorney, had been sufficiently served and notified.

The Court agrees with Montana that service was not properly effectuated pursuant to Federal Rule of Civil Procedure 4(i)(4). The Court does not find that LR IC 4-1 saves Plaintiffs' argument here, as the Rule is also clear that "service of documents in paper form is required . . . when the document is a summons or complaint." LR IC 4-1(c). The Court will also refuse to grant Plaintiffs additional time to cure this defect. While the Court is aware that it must give Plaintiffs reasonable time to cure, the Court finds that Plaintiffs have already had ample time to cure this defect. Fed. R. Civ. P.4(1)(4)(B). The Advisory Committee describes the cure provision as requiring that " [a] reasonable time to effect service on the United States must be allowed *after the failure is pointed out*." Advisory Committee Notes, 2000 Amendment, Rule 4 (emphasis added). Plaintiffs first became aware of this defect in service when Montana filed his motion to dismiss on April 22, 2019, raising this defense. Plaintiffs have made no subsequent effort to serve the United States almost a year later. Notice by a defendant that a plaintiff has not properly effectuated service under Rule 4(i) can be sufficient to trigger the reasonable time requirement. <u>Kurzberg v.</u>

*Ashcroft*, 619 F.3d 176, 185 (2d Cir. 2010) ("[N]otification to the plaintiff by the defendant, rather than by the court, of a defect in the service of process is sufficient to start the clock on the reasonable amount of time afforded to the plaintiff to cure the defect."). Accordingly, the Court will not grant Plaintiffs additional time to cure the defect and dismisses Montana from the 2016 case. As neither party disputes that Montana and the United States were properly served in the 2018 case, the Court finds that it has personal jurisdiction over Montana in the 2018 case.

### ii. The Court dismisses the wrongful death claim brought under the Federal Tort Claims Act as against Montana.

The Court dismisses the wrongful death claim brought under the Federal Tort Claims Act ("FTCA") (28 U.S.C. § 1346(b)) against Montana because only the United States is a proper defendant in a claim brought under the FTCA. Kennedy v. U.S. Postal Service, 145 F.3d 1077, 1078 (9th Cir. 1998) ("[T]he United States is the only proper party defendant in an FTCA action.").

### iii. The Court finds that Plaintiffs do not have a __Bivens__ remedy.

The Supreme Court case Bivens v. Six Unknown Named Agents, "recognized for the first time an implied private action for damages against federal officer alleged to have violated a citizen's constitutional rights." 403 U.S. 388, 397 (1971). "Specifically, the Supreme Court allowed a plaintiff to bring a damages action in federal court against individual federal officials for violating the Fourth Amendment, despite the absence of any federal statute authorizing such action." W. Radio Servs. Co. v. U.S. Forest Serv., 578 F.3d 1116, 1119 (9th Cir. 2009).

The Supreme Court has sharply circumscribed Bivens, however, and has since developed a test for determining whether Bivens remedies can be extended. Lanuza v. Love, 899 F.3d 1019, 1023 (9th Cir. 2018) (citing Ziglar v. Abbasi, 137 S. Ct. 1843 (2017)). First, the Court must determine whether the plaintiff is seeking a Bivens remedy in a new context. Lanuza, 899 F.3d at

1023. If not, then the analysis ends there. If the Court *does* find that the plaintiff is seeking a <u>Bivens</u> remedy in a new context, then the Court must determine whether "special factors counsel hesitation." <u>Lanuza</u>, 899 F.3d at 1023 (citing <u>Abbasi</u>, 137 S. Ct. at 1860). A case presents a new context if it is "different in a meaningful way from previous <u>Bivens</u> cases decided by the Supreme Court." <u>Lanuza</u>, 899 F.3d at 1023.

"A case can present a new context for <u>Bivens</u> purposes if it implicates a different constitutional right; if judicial precedents provide a less meaningful guide for official conduct; or if there are potential special factors that were not considered in previous <u>Bivens</u> cases." <u>Vega v. United States</u>, 881 F.3d 1146, 1153 (9th Cir. 2018) (citing <u>Abbasi</u>, 137 S. Ct. at 1864).

Although the Ninth Circuit has recognized that <u>Bivens</u> claims can be brought on Fourth Amendment excessive force violations, <u>Ting v. United States</u>, 927 F. 2d 1504, 1509 (9th Cir. 1991), the Court finds that the circumstances of the case here are such that they differ from previous actions in which either the Supreme Court or Ninth Circuit have found <u>Bivens</u> remedies to be available. <u>See</u> <u>Hernandez v. Mesa</u>, 140 S. Ct. 735, 743 (2020) ("A <u>Bivens</u> claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.").

There is not a sufficiently analogous case where either the Ninth Circuit or Supreme Court have considered whether false information transmitted on a radio could be considered integral participation in the violations of a person's Fourth Amendment rights to be free from excessive force or Fifth Amendment rights to be free from interference with familial relations.

In considering whether to recognize a <u>Bivens</u> remedy, the Court should consider whether there is an "alternative, existing process for protecting the interest," and then "whether there are special factors counseling hesitation in the absence of affirmative action by Congress." <u>Vega</u>, 881

F.3d at 1154. If there is an alternative remedial structure already in place, then that alone may suffice to find a <u>Bivens</u> remedy applicable. <u>Id</u>. The alternative remedial structure may take many forms, including administrative, statutory, equitable, and state law remedies. <u>Id</u>.

Plaintiffs have an alternative remedial structure in the form of the Federal Tort Claims Act, of which they have already taken advantage by filing a concurrent FTCA claim. The Supreme Court did recognize in <u>Carlson v. Green</u> that the FTCA may not always be as effective a remedy since a party cannot seek punitive damages, demand a jury trial, sue individuals, or assert a claim under the FTCA if there is no analogous state law tort available. 446 U.S. 21-23 (1980). But the alternative remedial structure and the potential <u>Bivens</u> remedy need not be identical, and "any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from a new and freestanding remedy in damages." <u>Vega</u>, 881 F.3d at 1155 (finding state law claims through FTCA appropriate alternative remedy)(internal citations omitted). Accordingly, the Court dismisses Plaintiffs' <u>Bivens</u> claims, and grants both Montana's motion to dismiss and motion for summary judgment.

**b. Defendants Bohanon, Walford, and Ledogar's Motion for Summary Judgment**

**1. Fourth Amendment Excessive Force Claim Against Bohanon and Walford**

Claims of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. <u>Graham v. Connor</u>, 490 U.S. 386, 395-97 (1989). Under this standard, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id.</u> at 397 (internal quotation marks omitted). In determining whether a particular use of force was unreasonable and thus in violation of the Fourth Amendment, courts must balance "the nature and

quality of the intrusion on the individual's Fourth Amendment interests" against the government's countervailing interests. Id.

In evaluating the governmental interest, the Court generally considers factors including (a) the severity of the suspect's alleged crime; (b) whether the suspect posed an immediate threat to the officers' safety; and (c) whether the suspect was actively resisting arrest or attempting to escape. Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 947 (9th Cir. 2017). Other factors relevant to the reasonableness of the force used include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." Id. citing Glenn v. Washington Cty., 673 F.3d 872 (9th Cir. 2011). Of all the considerations, the most important is whether the suspect posed an immediate threat to the safety of the officers or others, and when an officer uses deadly force, "this factor becomes a strict requirement." Id. (citing Tennessee v. Garner, 471 U.S. 1 (1985)). The factors are not exclusive, and the Court must consider the totality of the circumstances.

The Court finds that Bohanon and Walford's use of lethal force for the first volley of shots was reasonable. The key question for the Court's consideration is whether Bohanon's belief that Childress had a gun was an objectively reasonable one. While a mistaken belief that a suspect is armed may be reasonable in some circumstances, "[n]ot all errors in perception or judgment . . . are reasonable . . . . nor does the Constitution forgive every officer's mistake." Torres v. City of Madera, 648 F.3d 1119, 1123 – 24 (9th Cir. 2011). Where an officer's particular use of force is based on a mistake of act, the Court must ask whether a reasonable officer would have or *should* have accurately perceived that fact." Id.

Bohanon believed that Childress was an attempted homicide suspect. He also knew that a gun had been found in a car that Childress had been previously spotted exiting earlier that same day. Bohanon testified that he could not get a clear view of Childress's right arm, which clutched a black object in a way that suggested he might have been indexing a gun. Bohanon and Walford gave multiple warnings to Childress with which he did not comply. Bohanon specifically yelled at Childress that if he continued to walk toward them he would shoot and Childress did not comply. There is no evidence in the record that Childress had any substance abuse issues, mental health issues, or hearing issues that would have adversely affected his ability to hear Bohanon's commands.

Given the prior information that Bohanon had about Childress at that point, the Court does not find, given these facts, that Bohanon's belief that the black object in Childress's hands was a gun was objectively unreasonable. The Court subsequently also finds that Bohanon and Walford's use of lethal force was reasonable, given the severity of the crime they thought he had committed— attempted homicide—the fact that he had been evading arrest, and the fact that the moment when Childress started walking toward the officers, Bohanon could not see Childress's right hand.

Once Childress was on the ground however, the Court finds that a reasonable juror could conclude that Bohanon and Walford's continued shooting was unreasonable. Once Childress hit the ground, Bohanon and Walford both had time to reassess the situation prior to firing their second round of shots. Defendants argue that Childress was still a threat when he was on the ground because his hands were moving. Bohanon, Walford and Sida all testified they did not have a clear view of Childress's right hand side before the shots were fired, and Bohanon and Walford testified that his hands were moving while he was on the ground. But Bohanon also testified that he never specifically identified the black object as a gun, that he did not see Childress pull anything out of

his pocket, and that he saw no weapon in Childress's hand when he hit the ground. It is therefore an issue of disputed material fact whether or not Childress was moving in a threatening way after having been shot, and the Court finds that a reasonable juror could have found the second volley of shots unreasonable. Furthermore, if a jury so found, Officers Bohanon and Walford would not have been subject to qualified immunity.

In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, (1) whether the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Id. Under the second prong, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Id. at 1125 (internal quotation marks omitted). "This requires two separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." Green v. City & Cty. of San Francisco, 751 F.3d 1039, 1052 (9th Cir. 2014). While a case directly on point is not required in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011).

 Further, the right must be defined at "the appropriate level of generality ... [the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also al–Kidd, 563 U.S., at 741. The plaintiff bears the burden of proving that the right was clearly established. Id. at 1125. In deciding a claim of qualified immunity where a genuine dispute of material fact exists, the court accepts the version asserted by the non-moving party. See Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010).

In this case it would have been clearly established that, assuming Plaintiffs' version of events, shooting a suspect as he lay bleeding on the ground, who had pointed no weapon at the officers and who posed no threat of serious bodily injury was objectively unreasonable and violated the Fourth Amendment. In 2015, there was existing precedent that established that continued force against a suspect who no longer posed an immediate threat was unlawful. In Davis v. City of Las Vegas, the Ninth Circuit held that an officer violated the Fourth Amendment when he punched a handcuffed suspect in the face while he lay on the floor. 478 F.3d 1048, 1053 (9th Cir. 2007). In Drummond v. City of Anaheim, the Ninth Circuit found that officers used excessive force when they sat on a prone suspect's back and asphyxiated him. 343 F.3d 1052 (9th Cir. 2003). Finally, in Plumhoff v. Rickard, the Supreme Court, in holding that a police officer's use of deadly force against a suspect was not excessive, expressly noted that, "[t]his would be a different case if [the officers] had initiated a second round of shots after an initial round had clearly incapacitated [the suspect] and had ended any threat of continuing flight, or if [the suspect] had clearly given himself up." 572 U.S. 765, 777 (2014).

It would have been clearly established at the time of the shooting in 2015, that this was indeed a "different case" in which the officers continued to shoot at Childress despite his clear incapacitation, again assuming Plaintiffs' version of events. Accordingly, the Court will not grant summary judgment to Defendants on this claim.

**2. Fourth Amendment Excessive Force Claim against Officer Ledogar**

The Court finds that a reasonable juror could conclude that Officer Ledogar's deployment of the K9 was objectively unreasonable. Ledogar concedes in his deposition that Childress was not moving when the K-9 was unleashed on Childress. Construing all inferences in Plaintiffs' favor, a

reasonable juror could conclude that it would be objectively unreasonable to deploy a K9 on a person who had been shot several times and was severely bleeding on the ground.

Although use of a K9 and a K9 bite and hold of even up to a minute does not constitute use of deadly force, <u>Miller v. Clark Cty.</u>, 340 F.3d 959, 963–65 (9th Cir. 2003), the Court can still evaluate whether the use of a dog bite consists of excessive nondeadly force. <u>Id</u>. If Childress was lying on the ground, severely bleeding and not moving, a reasonable juror could certainly conclude that Childress did not pose an immediate threat to the officers or to other people. Accordingly, the government's interest in the use of force would ebb to its lowest point, and the use of the K-9 could constitute excessive force.

Leodogar would not be subject to qualified immunity on this claim, as it would have been clearly established that the use of a K9 on a suspect who lay dying on the ground and no longer posed an immediate threat was unreasonable. <u>Mendoza v. Block</u>, 27 F.3d 1357, 1362 ("[N]o particularized case law is necessary for deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."). While Childress was not yet handcuffed when the K9 was released on him, he was lying on the ground with his hands visible, bleeding profusely, and clearly incapacitated. This is sufficiently analogous to the situation described in <u>Mendoza</u>, and the Court denies summary judgment to Ledogar on this claim.

### 3. Fourth Amendment Denial of Medical Care Claim Against Officers Bohanon, Walford, and Ledogar

The Supreme Court has held that the Fourth Amendment Due Process Clause requires that medical care be provided to persons who are injured while being apprehended by the police. <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244 (1983). The Ninth Circuit has further clarified

that a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment. <u>Tatum v. City & Cty. of San Francisco</u>, 441 F.3d 1090, 1099 (9th Cir. 1990).

In <u>Tatum</u>, the Court specifically noted with regard to Fourth Amendment denial of medical care cases that the "critical inquiry is not whether the officers did all that they could have done, but whether they did all that the Fourth Amendment requires." <u>Id</u>. In that case officers did not perform CPR on a man who was having trouble breathing, but had immediately called for paramedics. "Here, the officers promptly requested medical assistance, and the Constitution required them to do no more." <u>Id</u>.

In this case, it is undisputed that Bohanon called for medical services within thirty seconds after the shooting. The Court finds that this is sufficient for purposes of the Fourth Amendment, and grants summary judgment to Defendants on this claim.

### 4. Fifth Amendment Substantive Due Process Claim

The Court grants summary judgment to Officers Bohanon, Walford and Leodogar on Plaintiffs' Fifth Amendment substantive due process claim. In order to make a claim that Plaintiffs have been deprived of a familial relationship with Childress that violates their substantive due process rights, they must prove that the officers' use of force shocked the conscience. <u>Gonzales v. City of Anaheim</u>, 747 F.3d 789, 797–98 (9th Cir. 2014). The Ninth Circuit has clarified that, "[w]here, as here, the officers did not have time to deliberate, a use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent  for reasons unrelated to legitimate law enforcement objectives." <u>Id</u>.   The Court does not find that Plaintiffs can make that showing. Plaintiffs cannot and have not produced any evidence that the officers had any ulterior motives for using force against Childress, other than their desire to eliminate any threat he may have posed to

themselves or others. Accordingly, the Court grants summary judgment to the officers on this claim.

### 5. State Law Claims

The Court finds that the officers are not entitled to summary judgment on the battery or negligence claims. A reasonable juror could find that the gunshots and dog bite were harmful intentional contacts to which Childress did not consent. Humboldt Gen. Hosp. v. Sixth Jud. Dist. Ct., 376 P.3d 167, 171 (Nev. 2016) ("A battery is an intentional and offensive touching of a person who has not consented to the touching."). To establish negligence under Nevada law, a party must establish, (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages. Clark County Sch. Dist. v. Payo, 403, P.3d 1270, 1279 (Nev. 2017). The Court finds that there are genuine issues of fact as to whether or not the officers' actions constituted negligence.

### c. Defendant United States' Motion for Summary Judgment

#### i. The Court Grants the United States Summary Judgment on All FTCA Claims.

Under the Federal Tort Claims Act ("FTCA"), when a government employee acting in the scope and course of her employment causes the death of another through her negligence, wrongful acts or omissions, the United States is liable therefor. 28 U.S.C. § 1346(b). The United States is thus liable for money damages "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (2010). In actions brought under the FTCA, the Court must apply the law state courts would use in an analogous tort action. Rhoden v. United States, 55 F.3d 428, 431 (9th Cir. 1995).

Nevada's wrongful death statute allows the heirs of the decedent to receive damages when the death of the decedent was caused by the wrongful act or neglect of another. Nev. Rev. Stat. §

41.085. To establish negligence under Nevada law, a party must establish, (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages. <u>Clark County Sch. Dist. v. Payo</u>, 403, P.3d 1270, 1279 (Nev. 2017). Whether a duty exists in the negligence context is a question of law. <u>Lee v. GLNV Corp.</u>, 22 P.3d 209, 212 (Nev. 2001).

Nevada abides by the public duty doctrine, which holds that the duty that fire and police departments is owed to the public, not specific individuals. <u>Coty v. Washoe Cty</u>., 839 P.2d 97, 99 (Nev. 1992). There are two exceptions to the doctrine. <u>Id</u>. The first is when the officers "made a specific promise or representation" upon which a person relied to their detriment. Nev. Rev. Stat. § 41.0336(1). The second exception is when the conduct of the officer "affirmatively causes" the harm. Nev. Rev. Stat. § 41.0336.(2).

Plaintiffs argue that a reasonable juror could find that a special relationship could have been created between Montana and Childress when Montana began to pursue Childress and called for LVMPD reinforcements. But Plaintiffs rely on the Ninth Circuit's federal common law conception of the public duty doctrine, rather than Nevada's. <u>See</u> <u>Ting v. United States</u>, 927 F.2d 1504, 1511 (9th Cir. 1991) (describe the "special relationship" exception to public duty doctrine). Plaintiffs have proffered no facts indicating that Montana  made a specific promise or representation to Childress upon which he relied. The Court therefore does not find that the first exception to the public duty doctrine applies.

Plaintiffs next argue that Montana "affirmatively caused" harm to Montana, and so Montana's conduct fell under the second exception to the public duty doctrine. The Nevada Supreme Court has found that "affirmatively caused the harm," as used in NRS 41.0336(2), means that "a public officer must actively create a situation which leads directly to the damaging result." <u>Coty</u>, 839 P.2d at 99.The Nevada Supreme Court has not explicitly stated whether the causation

- 23 -

standard under the "affirmatively caused the harm" exception to the public duty doctrine is identical to the causation analysis for negligence. However the Court infers from the Nevada Supreme Court's reference to "legal cause," that the two are sufficiently analogous. Coty, 839 P.2d at 760 – 61.

Causation, a necessary element to find negligence, consists of two components: actual cause and proximate cause. Dow Chemical Co. v. Mahlum, 970 P.2d 98, 107 (Nev. 1998) abrogated on other grounds by GES, Inc. v. Corbitt, 21 P.3d 11 (Nev. 2001). To demonstrate actual causation, a party must demonstrate that "*but for* defendant's negligence, his or her injuries would not have occurred." Sims v. Gen. Tel. & Elecs., 815 P.2d 151, 156 (Nev. 1991) overruled on other grounds by Tucker v. Action Equip. & Scaffold Co., Inc., 951 P.2d 1027 (Nev. 1997); overruled on other grounds by Richards v. Republic Silver State Disposal, Inc., 148 P.3d 684 (Nev. 2006). To demonstrate legal or proximate cause, a party must show that the defendant could have foreseen that his or her negligent conduct could have caused a particular variety of harm to a certain type of plaintiff. Sims, 815 P.2d at 156.

Plaintiffs cannot demonstrate that Montana's false transmission on the radio that Childress was wanted for attempted homicide  was the direct legal or actual cause of Childress's death. Undisputedly the direct cause of Childress's death was the volley of shots fired at him by Bohanon and Walford, premised on the belief that Childress was armed, not on the fact that he had been wanted for attempted homicide. Even if Montana had broadcast the correct crime—burglary, armed robbery, kidnapping, aggravated assault, and theft—Plaintiffs cannot demonstrate that this would have changed anything. Plaintiffs cannot demonstrate that it would have primed Bohanon or Walford to think of Childress as less dangerous, or that it would have have primed Bohanon to think that Childress was less likely to be armed.

While Bohanon may have stated that he wouldn't have left lunch for any crime less severe than attempted murder, what killed Childress wasn't that Bohanon left his lunch to join his pursuit, but that Bohanon believed Childress was armed. Because Plaintiffs cannot demonstrate that Montana's false transmission lead directly to Childress's death, they cannot demonstrate that an exception to the public duty applies, and the Court thus finds that Montana owed no duty to Childress as a matter of law and grants summary judgment to the United States on this claim.

## VI. CONCLUSION

**IT IS ORDERED** that Defendant Brian Montana's Motion to Dismiss (ECF No. 83) is GRANTED. The Court dismisses Defendant Brian Montana from this action with prejudice.

**IT IS FURTHER ORDERED** that Defendants Robert Bohanon, Las Vegas Metropolitan Police Department, James Ledogar, and Blake Walford's Motion for Summary Judgment (ECF No. 86) is DENIED in part and GRANTED in part. The Court grants summary judgment to Defendants on the Fifth Amendment Substantive Due Process and Fourth Amendment Denial of Medical Care claims, but denies summary judgment on Plaintiffs' state law claims and Fourth Amendment Excessive Force claim.

**IT IS FURTHER ORDERED** that Defendant Brian Montana's Motion for Summary Judgment (ECF No. 87) is GRANTED.

**IT IS FURTHER ORDERED** that Consol Defendant United States' Motion for Summary Judgment  (ECF No. 88) is GRANTED.

DATED March 31, 2020



_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

- 25 -